# IN THE COURT OF APPEALS OF IOWA

No. 24-1290
Filed May 21, 2025

IN RE THE MARRIAGE OF NICOLE A. HAPPEL
AND BRIAN D. HAPPEL

Upon the Petition of
**NICOLE A. HAPPEL, n/k/a NICOLE A. SHIMP,**
    Petitioner-Appellant/Cross-Appellee,

**And Concerning**
**BRIAN D. HAPPEL,**
    Respondent-Appellee/Cross-Appellant.

_____

Appeal from the Iowa District Court for Black Hawk County, Joel A. Dalrymple, Judge.

Nicole Shimp appeals the district court order modifying the visitation provisions of she and Brian Happel's dissolution decree. Happel also cross-appeals the district court's modification order, raising numerous arguments. **AFFIRMED ON APPEAL AND CROSS-APPEAL.**

Meredith L. Ludens of Shindler, Anderson, Goplerud & Weese, P.C., West Des Moines, for appellant/cross-appellee.

Lana L. Luhring of Laird & Luhring Law Office, Waverly, for appellee/cross-appellant.

Considered without oral argument by Greer, P.J., and Langholz and Sandy, JJ.

**SANDY, Judge.**

"No matter what, it's an argument," said Brian Happel. During this case, this statement has unfortunately proven to repeatedly ring true.

Nicole Shimp f/k/a Happel appeals the district court order modifying the visitation provisions of their dissolution decree. Nicole claims the district court erred by not granting her request for primary physical care of their three sons. Alternatively, she argues the district court erred by altering the summer visitation schedule to eliminate her Wednesday overnight visitation with the children.

Brian cross-appeals, claiming the district court erred by (1) denying his request for a week-on/week-off summer visitation schedule; (2) awarding Nicole $20,000 in trial attorney fees; and (3) incorrectly determining his income for child support purposes.

Upon our de novo review of the record, we affirm.

## I. Background Facts and Proceedings

This is the second contested modification action involving these parties in four years—both have found their way to our court. Brian and Nicole were married from 2009 until their divorce in 2017. Their marriage produced three sons—O.H., born in 2011; E.H., born in 2013; and C.H., born in 2015. The couple entered into a stipulated agreement under which they agreed to exercise joint legal custody and physical care of the children. The district court subsequently adopted and incorporated their stipulated agreement into its dissolution decree dissolving their marriage.

In May 2021, Brian petitioned to modify the joint physical care provision of the decree. In his petition, Brian requested that he be granted primary physical care of the children, subject to reasonable visitation with Nicole.

In July 2022, the district court issued its modification order, granting Brian's request for primary physical care of the couple's children. In explaining its decision, the district court noted Nicole's move to Parkersburg, her time-consuming job running a daycare, and the parties' difficulties in communicating—highlighted by her failure to disclose to Brian trauma perpetrated against O.H. The district court also set forth a visitation schedule for Nicole as part of the modification order. Under the order, Nicole was to have visitation with the children "every other weekend from Friday at 6:00 p.m. until they are delivered to their respective school on Monday morning." As for visitation during the summer, the order provided that Nicole would have visitation "every other weekend from Thursday at 6:00 p.m. until Monday morning at 9:00 a.m." Additionally, Nicole was to have "five weeks of summer parental time."[1]

Nicole appealed the district court's modification order, asserting Brian had not established a substantial change of circumstances to warrant a modification of their joint physical care arrangement. Alternatively, she argued the district court should have granted her midweek overnight visitation with the children. Brian cross-appealed, claiming the district court incorrectly determined his income for child support purposes. Ultimately, we affirmed the district court's decision to grant Brian primary physical care of the couple's three sons. *See In re Marriage of*

---

[1] Of relevance to this opinion, the district court determined Brian's gross income to be $100,000 for purposes of child support in the July 2022 modification order.

*Happel*, No. 22-1393, 2023 WL 2670032, at *2 (Iowa Ct. App. Mar. 29, 2023) (concluding Nicole's "multiple changes in employment, multiple moves, long work hours, and communication lapse amounted to a substantial change of circumstances" and Brian "established he was the superior caretaker").

However, we modified the district court's visitation schedule to provide Nicole with midweek overnight visitation on Wednesdays. *Id.* at *3. Specifically, we ordered that Nicole would have "midweek visits from Wednesday after school or from 9:00 a.m. if there is no school until school begins on Thursday morning or if no school on Thursday, until 9:00 a.m." *Id.* Additionally, we remanded back to the district court to consider Brian's income argument related to child support payments. *Id.* at *4 ("In light of our modification of the midweek visitation provision of the decree, we remand for recalculation of child support, at which time the parties may revisit the underlying income figures.").

Less than a month after our decision was issued, Brian filed a motion for clarification. The main impetus for the motion was Brian's belief that:

> The first issue that remains unresolved is whether or not the Wednesday midweek visitation continues during the summer months while the children are not in school. When combining both the Modified Decree and the Court of Appeals decision, it is unclear whether or not the Court of Appeals intended for the midweek visits to continue during the summer months.

The district court subsequently held a hearing on Brian's motion on July 7, 2023. During the hearing, regarding the issue of child support, the district court stated, "I'm not revisiting the actual amounts that I had attributed or incomes that I

attributed to both parties."[2] As for the issue of clarifying the summer visitation schedule, the court made the following comments:

> Counsel, I guess to be clear here, I'm going to be blunt. And I'm not—I don't want my blunt response here to be interpreted as directed at any person, nor do I want the appellate court to take issue with the district court by me being blunt.
>
> I am not going to clarify the Court of Appeals. That is not my job, and I'm not entering any kind of order today whatsoever to clarify the Court of Appeals' decision. It reads how it reads, and I'm not going to enter any kind of order to clarify it.
>
> My order reflected what I thought, to me, was appropriate for overnights. They saw it otherwise. They have the final say. It is what it is. Do I think what they meant is what is expressed in their final decision? No. But that's not for me to decide.
>
> I'm not sure if there is a 1.904 equivalent in the appellate procedure, but perhaps that's the way to address it. If the time has passed, then I guess my decision today will be final, and the appropriate thing is to appeal me and then in theory have the appellate court review its own decision and fix it by way of reversing me again, saying I should have at the district court done this in the clarification.
>
> But I'm gonna be clear, I'm not denying anybody an opportunity to make a record; but I'm just telling you, in advance of that record, I'm not touching this with a 10-foot pole. I'm not clarifying anything as far as what the appellate court did.

Four days after the clarification hearing, Brian filed a second petition for modification. In his petition, he asserted that there had been a substantial and material change in circumstances since our decision on appeal. Brian claimed, "the Court of Appeals decision regarding visitation has caused confusion and created conflict between the parties." He added, "[t]he District Court, in hearing on July 7, 2023, was not in a position to clarify this confusion, agreed that clarification was necessary, and suggested that a Modification would resolve this issue." Brian

---

[2] The district court did, however, state, "I will revisit the calculations to address the fact that now there are additional days attributed to Ms. Shimp." But the court expressed its belief that recalculating income figures would be inappropriate and would require a subsequent modification petition.

vaguely requested the district court to modify Nicole's visitation schedule.[3]  He also requested a modification of the child support provisions of the decree.  Nicole filed an answer to Brian's petition and asserted a counterclaim that she be granted primary physical care of the children.

The district court held a three-day modification trial in February 2024.  During the hearing, the court heard extensive testimony from Brian and Nicole.  Both testified that their communication has drastically deteriorated since the previous modification.    As Brian testified, "[i]nstead of, you know, simple communications back and forth, it always had to be long, drawn-out explanations or accusations."  He added, "[w]e literally cannot agree on anything."  Nicole echoed Brian's sentiments, testifying that Brian is frequently "belittling, demeaning" to her in their communications.  She also testified that, "like anything that Mr. Happel can do to dismiss my opinion, he does."

Throughout trial, it became evident much of the friction in Nicole and Brian's communications was caused by their sons' extensive involvement in extracurricular activities.  The children are involved in a wide variety of sports, such as: wrestling, rugby, baseball, basketball, and flag football.  In Nicole's view, Brian frequently discusses extracurricular activities with the boys before discussing them with her.  She added that Brian often mentions to the children that he will have to discuss things with her before they can participate in certain events or activities.

---

[3] Brian clarified in his testimony during the modification trial that he was requesting the district court to eliminate midweek overnight visitation for Nicole during the summer.  In his testimony, Brian requested the district court consider modifying the summer visitation schedule to utilize a "week-on/week-off schedule. Additionally, in his pre-trial brief, he requested that the district court eliminate midweek overnight visitation for Nicole during the school year.

She expressed a belief that this unfairly places the children in the middle of their disagreements and makes her out to be the bad guy. As she put it, "[i]f I'm not okay with it, I am automatically placed as the bad guy which is how [Brian] prefers it to be." Nicole also expressed concern that Brian's alleged habit of placing the children in the middle of their disagreements over their activities has led to her being alienated from their son O.H. Of note, at the time of trial, O.H. had started to refuse to participate in visitation with Nicole.[4]

Additionally, Brian and Nicole each generally accused each other of making medical decisions for the children over the objection or without the input of the other. They also accused each other of speaking poorly about the other in front of the children. In one incident, Brian testified that C.H. once came up to him and told him "Mom told me you never wanted me." In another incident involving C.H., Nicole testified that C.H. said to her that Brian told him it was her fault that he did not make a travel basketball team.

Following the trial, the district court issued its modification order. The district court denied Nicole's request to grant her primary physical care of the couple's children. The district court granted Brian's request to eliminate midweek overnight visitation for Nicole during the summer. But it denied his request to utilize a week-on/week-off request during the summer, as well as his request to eliminate midweek overnight visits during the school year. The court also granted Brian's request to change Nicole's income for child support purposes but denied his

---

[4] Brian has subsequently been found in contempt for O.H.'s refusal to not participate in visitation with Nicole and allowing O.H. to stay with him during Nicole's visitation time. Nicole has also recently been found in contempt for failure to insure the children.

request to change the gross income figure attributed to him. Lastly, the district court awarded Nicole $20,000 in trial attorney fees.

This appeal followed.

## II. Standard of Review

Our review for petitions to modify the physical care and visitation provisions of a dissolution decree is de novo. *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015). "Although we make our own findings of fact, 'when considering the credibility of witnesses the court gives weight to the findings of the trial court' even though we are not bound by them." *Id.* (citation omitted). "The best interest of the child is the governing factor in custody cases." *In re Marriage of Kirman*, No. 02-2002, 2003 WL 21230952, at *2 (Iowa Ct. App. May 29, 2002).

We address Nicole's arguments on appeal first and then move on to address Brian's claims on cross-appeal.

## III. Analysis

### A. Nicole's Appeal

#### 1. Physical Care

On appeal, Nicole contends the district court erred by denying her request to modify the decree to place primary physical custody of the children with her. She contends the evidence at trial showed a substantial change in circumstances had occurred due to "breakdown in communication, Brian placing the children in the middle, driving a wedge between [herself] and the children, and engaging in parental alienation." She also asserts Brian's "attempts to exclude [her] from decisions and participating in the children's appointments, activities, and events" constitutes a substantial change circumstances. Additionally, she believes the

evidence presented at trial establishes she is the parent who can offer superior care for the children. While this is a close case, we cannot agree that the district court was wrong in declining to grant Nicole's request for primary physical care of the children.

"[O]nce custody has been fixed it should be disturbed for only the most cogent reasons." *In re Marriage of Brown*, 778 N.W.2d 47, 52 (Iowa Ct. App. 2009). Consequently, a party seeking to change physical care from one parent to the other bears an especially "heavy burden." *Id.* Our supreme court long ago laid out the burden a parent seeking modification must carry:

> To change a custodial provision of a dissolution decree, the applying party must establish by a preponderance of evidence that conditions since the decree was entered have so materially and substantially changed that the children's best interests make it expedient to make the requested change. The changed circumstances must not have been contemplated by the court when the decree was entered, and they must be more or less permanent, not temporary. They must relate to the welfare of the children. A parent seeking to take custody from the other must prove an ability to minister more effectively to the children's well being.

*In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983).

We begin our analysis by noting that many of the behaviors Nicole accuses Brian of have been found sufficient to warrant a modification of physical care in the past. For instance, there is evidence in the record suggesting Brian has shut out Nicole regarding certain medical decisions concerning the boys. In one email sent by Brian to Nicole, he wrote, "I don't need your consent to seek medical treatment for the boys." Nicole also testified that Brian has taken the boys out of school for medical appointments without informing her. Additionally, there is evidence that Brian engaged a counselor—despite Nicole's objections—for the boys. Such

behavior violates the custodial rights of Nicole and has previously been found to be sufficient to trigger a modification. *See In re Marriage of Stanley*, No. 16-1822, 2017 WL 1278364, at *2 (Iowa Ct. App. Apr. 5, 2017) (affirming a modification where one parent refused to consult or cooperate with the other parent on matters concerning the child's welfare, such as education and therapy).

Further, we are especially mindful of the evidence in the record that Brian has spoken poorly about Nicole in front of the boys and inappropriately placed them in the middle of his disagreements with her about their extracurricular activities. Nicole testified that C.H. said to her that Brian told him she was the reason he did not make a travel basketball team. Nicole also testified that the boys have informed her that Brian speaks negatively about her in front of them. More importantly, the district court explicitly found that Brian "continues to routinely place the children in the middle by discussing the activities with the children and then directing the children to broach the subject with their mother, thus placing [her] in a difficult position."[5] The district court added, "[i]f she presents any form of

---

[5] In his brief, Brian contends the district court erred by finding he placed the children in the middle of his disputes with Nicole over extracurricular activities. He claims this error is attributable to the fact that the district court allocated time unevenly to the parties to present their cases. "It is generally recognized that matters relating to the course and conduct of a trial, not regulated by statute or rule, are within the discretion of the trial judge." *In re Marriage of Ihle*, 577 N.W.2d 64, 67 (Iowa Ct. App. 1998). Consequently, we have recognized that the district court has the inherent power to set reasonable time limits for trials. *See id.* (noting the power to set reasonable time limits for a trial is an "inherent power" of the district court). But time limits must "be allocated evenly so they are fair to both sides of the case." *Id.* at 68. Here, we have no difficulty in concluding that the district court did not allocate the time at trial evenly between the parties. But Brian has made no proffer of the evidence he would have presented—if time had been evenly allotted—that would have contradicted the district court's finding that he placed the children in the middle of he and Nicole's disputes about extracurricular activities. Thus, we cannot conclude Brian was prejudiced. *See id.* at 69 (noting

resistance to the activity, the children immediately resent her." This finding is most applicable to O.H., who prior to trial refused to participate in visitation with Nicole, presumably because she did not allow him to attend a wrestling tournament in Tulsa, Oklahoma on her parenting time. Such behavior by Brian is very concerning. *See In re Marriage of Walters*, No. 11-1746, 2012 WL 2411183, at *3 (Iowa Ct. App. June 27, 2012) ("One parent's actions which undermine the children's relationship with the other parent can be the triggering event for modification.").

The communication breakdown between the parties is also notable. We need not repeat each party's view on their communication difficulties but suffice to say Brian and Nicole agree that they cannot effectively communicate with one another concerning the children. And Brian is not without blame for the parties' difficulties in communicating. A breakdown in parties' communications concerning their children has long been recognized as a ground for modification of physical care. *See In re Stanley*, 411 N.W.2d 698, 701 (Iowa Ct. App. 1987) ("The continued inability or unwillingness of parents to [communicate] is a factor in determining if a custody modification is appropriate.").

But despite these issues, we conclude modification is not appropriate in this case for two reasons. First, we find it difficult to find a substantial change in circumstances has occurred when Nicole engages in many of the same behaviors she accuses Brian of. For example, Nicole has scheduled at least two medical

---

"it is equally incumbent upon the party seeking additional time to present evidence to establish prejudice. We will not presume the existence of prejudice when evidence is excluded from trial").

appointments for E.H. and C.H.—over Brian's objections—with a doctor who is a personal acquittance of hers. She has also included the boys in her individual counseling over Brian's objections. And she unilaterally terminated the children's relationship with their previous therapist without consulting Brian.[6]

Additionally, Brian testified that he's heard Nicole speak negatively about him in front of the children. During his testimony, Brian added that Nicole once included their son E.H. in a group text message conversation, in which they were discussing whether he could attend a church camp. Further, Nicole admitted during cross-examination that she has recorded the children without their knowledge to help establish that Brian's accusations against her are false. We can hardly think of something that could place the children more in the middle of these parents' disputes.

And like the district court, we believe both parties bear responsibility for their communication difficulties. Nicole does not have clean hands on this issue. Concerning the breakdown in the parties' communications, the district court wrote "[Nicole] clearly suffers from some type PTSD or similar diagnosis. Consequently, any actions or behaviors of [Brian] are often taken out of context or blown out of proportion."[7] We defer to this observation concerning Nicole for pragmatic reasons. *See In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984) (noting the district court is in a better position to make wise decisions in dissolution cases because it observes and listens to the witnesses in person, whereas appellate

---

[6] Nicole justified her decision to terminate the children's relationship with this counselor because the counselor was accused of impropriety with a client.

[7] During the modification trial, Nicole testified that she suffers from PTSD.

courts "must rely on the printed record in evaluating the evidence"). In short, we defer to the district court's balancing of bad behaviors.

Second, we conclude Nicole did not carry her burden to establish that she can offer superior care. Simply put, Nicole offered scant evidence concerning her ability to offer superior care. In contrast, Brian offered the testimony of Ann Olsen—his friend and neighbor—to help establish that he is the parent who can offer superior care of the children. Olsen testified that Brian is an "excellent parent" who is "very responsive to the emotional needs of the boys." She added, "[h]e has rearranged his entire life, including potentially getting married again, around these kids to provide stability for them." Olsen opined that a change in primary physical care would be "devastating" to the children because they would be uprooted from their community and support system.

The children have been placed under the primary physical care of Brian for the past two years. We do not doubt that Nicole is a good parent and that she loves the children, but it is in the children's best interests that they continue to enjoy the stability they have found with Brian. *See Rolling v. Hoffman*, No. 14-0102, 2014 WL 2600315, at *2 (Iowa Ct. App. June 11, 2014) ("In custody modification cases, stability is the trump card.").

This is unquestionably a close case. But the words of one of our former colleagues are applicable in a case like this one. *See Nelson v. Wieling*, No. 04-0135, 2004 WL 2002677, at *2 (Iowa Ct. App. Sept. 4, 2004) (Mahan, J., concurring specially) ("This is the type of close case where this court should defer to the district court decision."). Accordingly, we conclude the district court did not err by denying Nicole's request for primary physical care of the children.

*2. Alteration of Summer Visitation Schedule*

In the alternative, Nicole asserts the district court erred by eliminating her midweek overnight visitation during the summer. She argues Brian did not establish a material change in circumstances sufficient to warrant a modification of the visitation schedule. We disagree.

"The showing required for modification of the visitation provisions of a decree is less significant than the showing required to modify the custody and care provisions of a decree." *In re Marriage of Yazigi*, No. 13-1553, 2015 WL 1046129, at *2 (Iowa Ct. App. Mar. 11, 2015). "The parent seeking to modify child visitation provisions of a dissolution decree must establish by a preponderance of evidence that there has been a material change in circumstances since the decree and that the requested change in visitation is in the best interests of the children." *In re Marriage of Salmon*, 519 N.W.2d 94, 95–96 (Iowa Ct. App. 1994).

As an initial matter, we conclude Brian has established a material change in circumstances sufficient to warrant a modification of the visitation provisions of the decree. Based on the evidence at trial, it is evident that Brian and Nicole cannot effectively communicate about the children. There was also evidence suggesting the parents' strife has negatively impacted the children. Brian testified at trial that he and Nicole's discord "just creates confusion" in the children's minds. Additionally, during a tense exchange between Nicole and Brian at one of C.H.'s doctor's appointments, C.H. "put his hands over his ears" and looked down at his lap. And the evidence shows Brian and Nicole's discord over the children's extracurricular activities has had a negative impact on Nicole's relationship with O.H. We believe such evidence establishes Brian and Nicole's discord has

negatively impacted the children. Accordingly, there has been a material change in circumstances. *See In re Marriage of Rees*, No. 04-1380, 2005 WL 975653, at *2 (Iowa Ct. App. Apr. 28, 2005) (concluding a sufficient material change in circumstances occurred due to the parents' discord negatively affecting the children's lives).

We also conclude a modification to the summer visitation schedule is in the children's best interests. "Generally, liberal visitation is in the children's best interests as it maximizes physical and emotional contact with both parents." *Id.* However, the alteration to the summer visitation schedule made by the district court does not dramatically reduce Nicole's visitation with the children. Her Wednesday night overnight visitation with the children remains intact during the school year. And she will still receive an extended visitation with the children every other weekend—beginning on Thursday's—during the summer. She also still retains five weeks of parenting time during the summer. The district court struck a balance of preserving adequate parenting time for Nicole while attempting to ease the discord between the parents. *See id.* (concluding the district court's modification of the visitation provision of a decree was in the children's best interests because it did not dramatically alter the father's visitation time and was designed to alleviate issues causing discord between the parents). Again, we defer to the district court's balancing of competing interests.

Thus, we conclude the district court did not err by eliminating midweek overnight visits for Nicole during the summer.

**B. Brian's Cross-Appeal**

*1. Alteration of Summer Visitation Schedule*

On cross-appeal, Brian contends the district court erred by not further altering the summer visitation schedule to set a week-on/week-off schedule for him and Nicole. He notes the parties have frequently had disagreements over scheduling vacations around each other's parenting time during the summers. According to Brian, his proposed week-on/week-off schedule would minimize disagreements between him and Nicole and better serves the children's best interests. We disagree.

As previously mentioned, the showing required for a modification to the visitation provisions of a dissolution decree is less than showing for a modification of physical care. *Yazigi*, 2015 WL 1046129, at *2. The party seeking modification of the visitation provisions of a dissolution decree must establish that a material change in circumstances has occurred and that the requested change is in the children's best interests. *Salmon*, 519 N.W.2d at 95–96.

For the reasons articulated above, we believe a material change in circumstances has occurred to warrant a modification of the summer visitation schedule. And we acknowledge that summer vacation planning under the current arrangement has contributed to the communication breakdown between the parties. However, Brian's proposed schedule would only add to the discord. A week-on/week-off in the summer will likely increase the interactions between Nicole and Brian and potentially lead to the children being exposed to more of their parents' strife. The evidence shows the children have felt the negative effects of their parents' discord. Thus, the fewer exchanges the better. Because Brian and

Nicole have not shown they can effectively communicate for the sake of the children, we cannot conclude a visitation schedule that will likely lead to weekly interactions between them in the summer serves the children's best interests.

Therefore, we find the district court properly denied Brian's request for week-on/week-off summer visitation schedule.

### 2. Trial Attorney Fees

Moving on, Brian contends the district court erred in awarding Nicole $20,000 in attorney fees. He asserts that he largely prevailed on the issues at trial and that Nicole did not prevail on her requests. Additionally, he asserts the fees awarded were not fair and reasonable. Lastly, he asserts that because he prevailed on most issues at trial, that the district court should have awarded him trial attorney fees. We disagree with Brian and conclude the district court did not err in awarding Nicole attorney fees. We also decline his request for trial attorney fees.

In a modification action, the district court may "award the prevailing party reasonable attorney fees." Iowa Code § 600B.26 (2023). In considering whether to award attorney fees in a modification action, the district court should consider "the respective abilities of the parties to pay." *Christy v. Lenz*, 878 N.W.2d 461, 469 (Iowa Ct. App. 2016) (citation omitted). Additionally, the district court may consider whether the party resisting modification was successful. *In re Marriage of Michael*, 839 N.W.2d 630, 639 (Iowa 2013). We have consistently emphasized that awards of trial attorney fees "must be fair and reasonable." *In re Marriage of Olson*, 20-0399, 2021 WL 1904689, at *5 (Iowa Ct. App. May 12, 2021) (citation omitted).

With these principles in mind, we conclude the district court did not abuse its discretion in awarding Nicole $20,000 in trial attorney fees. Although Nicole did not prevail on her request for primary physical care, we agree with the district court that she largely prevailed at trial in defending the action. While Brian prevailed on his requests to change the summer visitation schedule and his request to change Nicole's income for child support purposes—Nicole prevailed in defending against Brian's claims to modify the summer visitation schedule further, eliminate Wednesday overnight visits during the school year, and change his income for child support purposes.

Nor can we agree that the award of attorney fees to Nicole was unfair or unreasonable. Brian argues that the attorney fee award was unreasonable because Nicole originally did not submit an itemized attorney fee affidavit with her request. *See In re Marriage of Sanders*, No. 22-1963, 2024 WL 2842310, at *7 (Iowa Ct. App. June 5, 2024) ("Because the court had no itemization in making this large award, we cannot assess whether the fees awarded were 'fair and reasonable.'"). While it is true Nicole originally did not submit an itemized attorney fee affidavit with her request for attorney fees, she did attach an itemized billing sheet to her response to Brian's amended rule 1.904(2) motion. And because the district court ultimately ruled on Brian's motion to enlarge and reconsider, we conclude this effectively cured any defect in Nicole's request for attorney fees.

Given the wide discretion the district court possesses in awarding trial attorney fees, *see Michael*, 839 N.W.2d at 639, we cannot conclude the district court abused its discretion by awarding Nicole trial attorney fees. And given that

Brian did not prevail on most of his requests at trial, we decline to conclude that the district court should have awarded him trial attorney fees.

### 3. Income for Child Support

Brian also argues the district court erred in attributing $100,000 in gross income to him for purposes of child support calculations. As a largely self-employed individual, Brian claims the district court should have used a four-year average of the income shown on his tax returns to arrive at a gross income figure. He claims this is appropriate to do because his income has fluctuated "greatly over the past four years from as a low as $17,259 annually to $62,306." We disagree and conclude the district court did not err in determining Brian's gross income.

"We calculate a child support obligation using the child support guidelines." *In re Marriage of Leff*, No. 19-0038, 2020 WL 564901, at *2 (Iowa Ct. App. Feb. 5, 2020). To calculate the child support obligation, the district court should start by determining the parties' gross incomes. Iowa Ct. R. 9.14. A party's gross income is his or her "reasonably expected income from all sources." Iowa Ct. R. 9.5(1). "We must determine gross 'income from the most reliable evidence presented.'" *Leff*, 2020 WL 564901, at *2 (citation omitted). "Generally, the best evidence of income comes from completed income tax returns." *In re Marriage of Sommerville*, No. 21-1672, 2023 WL 4521540, at *2 (Iowa Ct. App. July 13, 2023).

To begin our analysis, it is necessary to briefly provide some factual background on Brian's employment. Brian is employed as a realtor at a local real estate firm in the Cedar Falls area. Additionally, he operates a small general contracting business—BNKD Homes, LLC (BNKD). Brian is the sole shareholder of BNKD. At trial, Brian's tax returns from 2019 to 2022 were offered and admitted

into evidence. Brian testified that a four-year average of his income from these years amounted to an income of $37,000 a year.

With self-employed individuals, we often average their income over a period of years due to the wide fluctuations in income they can experience. *In re Marriage of Cossel*, 487 N.W.2d 679, 681 (Iowa Ct. App. 1992) ("To establish [an] . . . income for a self-employed person or one who has fluctuating . . . income, it generally is best to use an average of income from a period that accurately reflects the fluctuations in income."). But like the district court, we are highly skeptical of the income figures Brian attempts to attribute to himself. Thus, we have little faith that an average of the income figures from his tax returns from 2019 to 2022 will result in even a remotely accurate figure for his true gross income. Despite Brian's purported modest income, evidence was presented at trial that Brian spent over $57,000—in both 2022 and 2023—in just credit card payments. And Brian testified at trial that he is generally conservative with his finances and does not spend money he does not have. There was also evidence presented at trial that Brian deposited significant amounts of money into his personal bank account from 2021 to 2023.

For example, the evidence shows Brian deposited nearly $125,000 in his personal account throughout the year in 2021. In 2023, he deposited into his bank account a total of $114,456. Brian also admitted to purchasing a $85,000 boat in 2022. And he estimated at trial that his monthly expenses totaled roughly $6700. It does not take a mathematician to see that the numbers do not add up. In rejecting Brian's requests to utilize his income—as stated on his tax returns—and to average such income, the district court stated his "income simply does not

comport with the lifestyle in which he lives."  Given the evidence before us, we share this belief and cannot conclude the district court erred on this ground.  *See In re Marriage of Claar*, No. 05-0174, 2006 WL 334219, at *3 (Iowa Ct. App. Feb. 16, 2006) (concluding income figures from the parties' tax returns were "of little value in calculating child support" because of the comfortable lifestyles they lived).

Instead of consulting Brian's tax returns and averaging his income, the district court determined Brian's gross income to be $100,000.  It is not entirely clear how the district court came up with this income figure.  In all likelihood, the district court came up with this figure based off Brian's loan application from 2022 to purchase his boat.  In this application, which was admitted at trial, Brian listed his gross income as $100,000.  Brian attempted to downplay this evidence at trial, testifying that a loan officer filled out the application for him.  But the district court expressly found this testimony to not be credible.  And we defer to the district court on witness credibility determinations.  *See Hoffman*, 867 N.W.2d at 32.  Given the evidence in this record, we believe $100,000 is a reasonable figure for Brian's gross income.

Consequently, we find the district court did not err in determining Brian's gross income to be $100,000 for child support calculations.

### C.  Appellate Attorney Fees

Finally, Nicole and Brian each request that we award them appellate attorney fees.  An award of appellate attorney fees is not a matter of right but rests in this court's sound discretion.  *In re Marriage of Towne*, 966 N.W.2d 668, 680 (Iowa Ct. App. 2021).  "In determining whether to award appellate attorney fees, we consider 'the needs of the party seeking the award, the ability of the other party

to pay, and the relative merits of the appeal.'" *In re Marriage of McDermott*, 827 N.W.2d 671, 687 (Iowa 2013) (citation omitted).

After considering these factors, we decline to award either party appellate attorney fees.

**IV. Conclusion**

In sum, we affirm the district court's modification order in full.

**AFFIRMED ON APPEAL AND CROSS-APPEAL.**